**Suheel NAJAFI, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 03–CF–870.

District of Columbia Court of Appeals.

Argued Oct. 6, 2005.

Decided Nov. 10, 2005.

Gregory A. Cotter, appointed by the court, for appellant.

David Goodhand, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Thomas J. Tourish, Jr., Rhonda T. Redwood–Ray, and Melissa M. Nasrah, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ, and REID, Associate Judges.

SCHWELB, Associate Judge:

A jury convicted Suheel Najafi of distribution of a controlled substance (ecstasy).[1] The case arose from the alleged sale by Najafi of two ecstasy pills to Metropolitan Police Officer John McDonald at the Nations Nightclub in the early morning hours of September 14, 2002. On appeal, Najafi contends that the trial judge abused his discretion by denying Najafi's motion for a mistrial.

At the beginning of his opening statement, the prosecutor repeatedly claimed that Najafi was "running a business" of selling drugs. The prosecutor further asserted that the sale of two pills to Officer McDonald occurred "while [Najafi was] running his business." The record shows, however, that the prosecution never introduced, or expected to introduce, any evidence that Najafi engaged in any unlawful conduct (or, indeed, in any business) other than the alleged sale of the two pills which the prosecutor described as having occurred "while" Najafi was conducting his business.

In our view, the prosecutor's challenged remarks were demonstrably improper. The supposed facts as described by the prosecutor went well beyond any evidence that the government expected to present, and beyond any reasonable inference from the evidence. The prosecutor implied that the government had knowledge of unlawful conduct on the part of Najafi in addition to, and more serious than, the alleged sale of the two tablets. Fundamentally, the prosecutor's statement was untrue.

---

1. The technical name of "ecstasy" is methy-lenedioxymethamphetamine (MDMA).

The impropriety of the opening statement does not, however, end our inquiry. In this case, the government's evidence was uncontradicted and overwhelming. It is undisputed that the three twenty-dollar bills (with pre-recorded serial numbers) with which Officer McDonald purchased the pills were found on Najafi's person. No innocent explanation of this uncontradicted and incriminatory fact was provided by the defense. Accordingly, we conclude that Najafi was not substantially prejudiced by the improper remarks in the prosecutor's opening statement, that reversal of his conviction is not warranted, and that the judgment must be affirmed.

## I.

## THE TRIAL COURT PROCEEDINGS

### A. *The evidence.*

The principal witness for the prosecution was Officer McDonald. McDonald testified without objection that prior to his arrival on the scene, the police had information regarding "large illegal narcotics sales going on at Nations Nightclub." McDonald went to the club in civilian clothes for the purpose of purchasing illegal drugs. He was accompanied by other officers who constituted the "arrest team."

Officer McDonald testified that, after he had been at the club for what seemed to him to be a long period of time, he saw Najafi "resting on the railing overlooking [the club's] dance floor." McDonald engaged Najafi in conversation and inquired if Najafi had any ecstasy that McDonald could purchase from him. According to

Officer McDonald, Najafi initially stated that he did not have any ecstasy. After the two men had briefly conversed, however, Najafi left. Shortly thereafter, Najafi returned, and he asked Officer McDonald how many pills he wanted. McDonald responded that he wanted one. Najafi departed again, returned once more, and offered to sell Officer McDonald two ecstasy pills for $50.00. McDonald accepted Najafi's offer. The officer then gave Najafi three twenty-dollar bills, the serial numbers of which the police had pre-recorded; Najafi gave McDonald $8.00 in change and stated that he still owed McDonald two dollars.

After the above-described payment had been completed, Najafi walked to an ottoman some twenty feet away and appeared to "ball up" something in a white piece of paper which was located next to a water bottle on the floor. Najafi then told Officer McDonald that the two ecstasy pills were wrapped in this white paper. The police recovered both the paper, which turned out to be an ATM receipt with Najafi's name on it, and two ecstasy pills, which were wrapped inside the receipt. Najafi was arrested, handcuffed and searched; no contraband was found on his person or in his automobile.[2] A member of the arrest team testified that in a search incident to Najafi's arrest, the police recovered the three twenty-dollar bills that Officer McDonald had used to purchase the pills. The serial numbers of the bills matched the numbers previously recorded by the police.

The defense rested without presenting any evidence.[3]

---

2. Najafi consented to a search of his car.

3. Najafi's attorney initially informed the court that his client intended to testify, but Najafi subsequently changed his mind. In his opening statement, defense counsel represented that Najafi had no ecstasy pills in his posses-

sion, but that Najafi had "led on" McDonald in the hope of "fleecing" him by pretending to make a sale and then leaving with McDonald's money. In other words, Najafi intended, according to his attorney, to steal Officer McDonald's money, but Najafi did not distribute any unlawful drugs. Be that as it

B. *The prosecution's opening statement and the motion for a mistrial.*

In his opening statement for the government, the prosecutor began as follows:

Ladies and gentlemen, on September 14, 2002, at 1015 Half Street, Southeast, in Washington, D.C., the defendant, Mr. Suheel Najafi, was running a business.

He was selling drugs for a profit. He was selling ecstasy at the Nations Nightclub at that address.

Now, at 3:30 in the morning on September 14, Mr. Najafi while running his business sold ecstasy tablets to an undercover police officer from the Metropolitan Police Department, Officer John McDonald.

And at that point, the Metropolitan Police Department shut down Mr. Najafi's business. And how are you going to know these things? How are you going to know what kind of business Mr. Najafi was running that night? You will hear from those same officers who were at the Nations Nightclub back on September 14, 2002, those same eyewitnesses who observed Mr. Najafi conducting his business on that night.

A few sentences later, the prosecutor told the jurors that "those officers were there because they had information about drug trafficking at that address." [4]

At the conclusion of the prosecutor's opening statement, Najafi's attorney made an oral motion for a mistrial:

Your Honor, I am constrained to request a mistrial on the basis of that comment by [the prosecutor] about Mr. Najafi running a business. There is not going to be any evidence that he was

running any sort of business, that if they had evidence of that, then that would be other crimes evidence that I should have gotten notice of, and didn't get notice of. I found his comments to be extremely prejudicial and object on that basis. I move for a mistrial.

\* \* \*

My point would be as well in the case Mr. Najafi is running a business that would suggest that in addition to this particular sale there were other sales.

The trial judge denied the defense motion because "I think you can say this was a commercial venture business, a business deal." The judge pointed out that the offense of distribution of a controlled substance "doesn't depend on whether there is consideration [or] compensation," and

I think the prosecutor points out that he wasn't just distributing it, which would be a criminal offense, he was doing it for money which permits you to characterize it as a business operation.

After the judge denied the defense motion for a mistrial, Najafi's attorney told the jury in his own opening statement that, contrary to the prosecutor's representation, "there is not going to be any evidence of any business [or] of any ongoing enterprise by Mr. Najafi or anyone else." Thereafter, there was only one further reference during the remainder of the trial of the claim that Najafi was running a drug-selling business; during his closing argument, defense counsel stated:

If you remember when the prosecution started this case, they said that Mr. Najafi was running a business and they

---

may, defense counsel's statements are not evidence, and the defense presented no evidence to support the representations in Najafi's counsel's opening statement. Indeed, the defense did not introduce any evidence at all.

**4.** Officer McDonald explained early in his testimony that the person in charge of the operation had learned "that there was a large illegal narcotics sale[ ] going on at the Nations Nightclub."

wanted to shut down the business. Well, the only thing he appears to have been doing is watching the dancing below.

That behavior I submit is innocent.[5]

At the conclusion of the trial, the jury found Najafi guilty as charged. This appeal followed.

## II.

## LEGAL ANALYSIS

A. *Standard of review.*

In this case, "although [Najafi's] complaint is primarily with the prosecutor, it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Irick v. United States*, 565 A.2d 26, 33 (D.C.1989). Here, the trial judge's dispositive ruling was his denial of Najafi's motion for a mistrial.

▮▮▮ A motion for a mistrial is confided to the sound discretion of the trial judge. *Lee v. United States*, 562 A.2d 1202, 1204 (D.C.1989); *see also Peyton v. United States*, 709 A.2d 65, 69 (D.C.1998). "A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Salmon v. United States*, 719 A.2d 949, 956 (D.C.1997) (quoting *United States v. Clarke*, 306 U.S.App. D.C. 251, 264, 24 F.3d 257, 270 (1994)). This is so because a mistrial generally "entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a

trial[6] that has already taken place." *Salmon*, 719 A.2d at 956 (quoting *United States v. Mechanik*, 475 U.S. 66, 72, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)). In this case, however, the declaration of a mistrial would have nullified only the selection of the jury and the prosecution's opening statement, and the reasons for avoiding the declaration of a mistrial if possible are in some measure less compelling here than if the motion had been made later in the trial.

B. *Improper prosecutorial argument.*

▮▮▮ When reviewing a claim of improper prosecutorial argument,[7] we must first determine whether the prosecutor's challenged comments were improper. *Irick*, 565 A.2d at 32. If the court concludes that the comments were improper, reversal may or may not be warranted; the court must evaluate the prosecutor's challenged remarks in context rather than in isolation. Included in the court's calculus should be: "[1.] the gravity of the [improper comments]; [2.] [their] relationship to the issue of guilt; [3.] the effect of any corrective action by the trial judge; and [4.] the strength of the government's case." *Dixon v. United States*, 565 A.2d 72, 79 (D.C.1989) (citations omitted). Based on these considerations, the conviction should be reversed only if the defendant suffered substantial prejudice, and we must affirm if the error was harmless. *Id.* As to harmlessness, our inquiry is whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judg-

---

5. In light of Officer McDonald's uncontradicted testimony, this was a somewhat less than complete or objective description of the evidence regarding what Najafi appeared to be doing.

6. Or here, a part of a trial.

7. Although an opening statement technically is not "argument," we believe that the basic principles governing claims of improper prosecutorial argument apply with equal force where, as here, the alleged impropriety occurred as a part of the prosecutor's opening statement.

ment was not substantially swayed by the error ...." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

C. *The impropriety of the government's opening statement.*

▮ The essence of Najafi's complaint is that, in his opening statement, the prosecutor asserted facts as to which he had no evidence, and that the prosecutor's misstatements potentially prejudiced the jury against Najafi. It is improper for counsel to misstate the evidence, *McGrier v. United States,* 597 A.2d 36, 48 (D.C.1991), or to refer in an opening statement to evidence without a good faith basis for believing that such evidence will be introduced. *Frederick v. United States,* 741 A.2d 427, 440 n. 25 (D.C.1999) (citing ABA STANDARDS FOR CRIMINAL JUSTICE 7.4 (The Defense Function) (1993)). Although the trial judge ruled otherwise, we are satisfied that the prosecutor's repeated assertions at the beginning of his presentation that Najafi was conducting a drug-selling business went well beyond any evidence that the government expected to introduce or could introduce. Especially in light of the manner in which the government's claim was presented, we conclude that the quoted portions of the opening statement were palpably improper.

In the first few paragraphs of the passage at issue, see p. 106, *supra,* the prosecutor asserted that Najafi was running or conducting a business, or selling drugs for a profit, *no fewer than six times.* The prosecutor also made it clear that the "business" which he asserted that Najafi was running consisted of more than a single sale of two ecstasy pills. He stated, on the contrary, that *"while* running his business, [Najafi] sold ecstasy tablets to an undercover police officer." The constant repetition of this theme at the very outset of the case could mean only one thing—the prosecutor, an officer of the court, was telling the jurors that Najafi was an entrepreneur in the drug business, and that he was caught while selling but one sample of his wares.

First impressions are not easy to dispel.[8] Whatever the prosecutor's subjective motivation may have been, the inevitable consequence of his opening salvo was to give the jury the impression that the case involved someone in the drug business—a person who had committed other crimes, in addition to the single sale at issue in the case—and that Najafi was not merely, for example, an individual who had opportunistically sought to turn Officer McDonald's request to buy ecstasy pills to his own advantage by making a single isolated sale. For aught that the record shows, however, Najafi may have been just such an opportunist, and no more.

We cannot agree with the government's theory, accepted by the trial judge, that Najafi was running a business because he allegedly made one sale of two pills. This interpretation cannot logically be reconciled with the allegation that Najafi made the sale *while* running his business. Moreover, one does not "run" a business

---

8. One commentator's assessment is revealing: Jurymen, in cases tried by effectual advocates, have been prone to say that once the opening statements were made there was nothing left to the case. This should be the prime objective of the opening statement.

    \* \* \*

    The first impression is most important.... [I]n the opening, the narrative, the outline of the flesh and bones of the case, the jury's first impressions harden like cement. No amount of instruction from the court that minds should not be made up until the conclusion of the case can prevent people from forming impressions.

    ALFRED S. JULIEN, OPENING STATEMENTS § 1.01, at 2 (2001).

by engaging in a single transaction. Finally, the prosecutor's speedy and incessant repetition of the theme—boom boom boom boom boom boom—in the very first sentences with which he began his initial address to the jury demonstrates beyond peradventure that this particular phrasing was important, even critical, to his presentation, and that he expected the jury so to regard it.[9] Under these circumstances, and weighing the potential prejudice against the comparatively minor burden that selection of a new jury would have placed on the court, parties, counsel, and jurors, we conclude that a mistrial was warranted and that the judge abused his discretion in refusing to declare one.

In *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the Court stated:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*See also Dyson v. United States*, 418 A.2d 127, 130 (D.C.1980) (quoting *Berger*). The conduct in *Berger* was more reprehensible than the prosecutor's comments in this case, but the principles of that decision nevertheless apply.

We recognize, and take seriously, the Supreme Court's admonition that the court should not attach the most sinister possible interpretation to a prosecutor's remarks. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643–44, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The challenged portion of the government's opening statement, however, was not made in the heat of battle, when lapses in syntax or in precision of expression are not surprising, and, in some instances, more excusable. The portrayal of Najafi as a man who was running a drug-selling business was not improvised on the

---

**9.** At oral argument, appellate counsel for the government asserted that the defense was complicit in the prosecutor's repetition of the "drug business" theme. Counsel reasoned that Najafi's attorney should have objected when the prosecutor first used the phrasing which Najafi now condemns. We disagree. We have held that "a motion for a mistrial at the end of the prosecutor's initial closing argument is timely, for a contrary rule would encourage disruptive interruptions of the prosecutor's closing." *Irick*, 565 A.2d at 32 n. 13 (citations omitted). Although the present case involves a motion for a mistrial at the end of the prosecutor's *opening* statement, interruptions would be just as disruptive at this stage of the trial as they are when made during a closing argument. The government's attempt to place blame on the defense for not interrupting the prosecutor—a course of action which would have risked the understandable ire of the court—is not at all persuasive.

spur of the moment, nor was it vague or ambiguous. Rather, it was obviously planned in advance. We do not think that the prosecutor struck a "fair" blow that can or should be countenanced under *Berger.* We emphasize that this kind of exaggeration and distortion—repeated characterization of a single alleged sale of two ecstasy pills as "running a [drug-selling] business"—has no place in a courtroom of the District of Columbia.

### D. *Harmless error analysis.*

■■■■ We turn now to the question whether the prosecutor's improper statements, and the trial judge's error in countenancing them, substantially prejudiced Najafi. To conclude that the error was harmless, we must find it "highly probable that the error did not contribute to the verdict." *Clark v. United States,* 593 A.2d 186, 192 (D.C.1991) (quoting *United States v. Tussa,* 816 F.2d 58, 67 (2d Cir.1987)) (internal quotation marks and brackets omitted).

Applying the four-part test which this court has utilized to determine whether improper prosecutorial statements have resulted in substantial prejudice to the accused, we conclude:

1. that the gravity of the impropriety, involving, as it did, a distortion of the record, was substantial;

2. that the prosecutor's improper statements were not central to the issue of guilt or innocence, for distribution of two ecstasy pills is a felony regardless of whether or not Najafi was running a business;

3. that although the judge took no corrective action specifically directed at the prosecutor's improper statements, he did inform the jury in his opening and closing instructions that the statements of counsel are not evidence; and

4. that the case for the prosecution was very strong indeed.

It is the fourth of the foregoing considerations—the overwhelming character of the government's case—that compels us to conclude that the judge's refusal to declare a mistrial was harmless error. The three twenty-dollar bills used by the police to purchase the pills were recovered from Najafi's person; there was no evidence to the contrary, and Najafi's attorney did not deny in his opening statement that Najafi was in possession of the bills with the telltale pre-recorded serial numbers. Officer McDonald's testimony that he recovered the two ecstasy pills from the location where Najafi told him they were likewise stands uncontradicted in the record. Indeed, Najafi presented no substantive defense at all to the government's prototypical undercover sale case, except to suggest that the officers were not consistent in their accounts and therefore not credible. Where, as here, the police produced the contraband,[10] when all three bills used to purchase it were found in the possession of the defendant, and when Najafi provided no explanation of his possession of the bills, the government had an extremely powerful case. It is difficult to imagine that the jury would have acquitted Najafi on this record, even if "running a business" had never been mentioned.

Moreover, in his own opening statement, and again in his closing argument, Najafi's attorney forcefully corrected the prosecutor's assertion that Najafi was running a drug-selling operation. Counsel pointed out that there was no evidence to support this implication that Najafi had committed

---

10. We think it inconsequential, with respect to Najafi's guilt or innocence, that after one of the pills was submitted to the Drug Enforcement Administration for testing, the prosecution produced only one pill, and not two, in court.

other crimes or habitually sold drugs. One can reasonably conclude that counsel's exposure of the lack of any evidence supporting the prosecutor's claim at least mitigated any damage caused by the prosecutor's improper comments.

One piece of evidence gives us pause. Officer McDonald's description of the manner in which Najafi sold him the pills reveals that Najafi was being very careful to distance himself from the contraband and to avoid being observed in possession of it. It might be viewed as astonishing that a defendant who took the precautions that Najafi took would nevertheless wrap the pills in an ATM statement *with his own name on it.* If, indeed, that is what Najafi did, then his carelessness was remarkable, for he served up proof of his guilt to the police, if not on a silver platter, then on its ATM receipt counterpart. A juror might perhaps question whether it is realistic to believe that Najafi acted so foolishly, and he or she might entertain a reasonable doubt regarding Najafi's guilt. Moreover, McDonald described the ATM receipt as "crumpled" when the pills were in it, and it appears that the receipt may have been less crumpled, or not crumpled at all, when it was introduced into evidence.

But if a juror were to doubt Najafi's guilt because, under the police version, he wrapped the pills in an ATM receipt with his own name on it, and because the juror did not believe that this version was plausible, then it is difficult to believe that this juror's doubt would be eliminated by the prosecutor's proclamation, never substantiated by any evidence, that Najafi was "running a business" of selling drugs. A juror who did not believe the police officers' sworn testimony would presumably disbelieve, *a fortiori*, allegations of running a business when there was no evidence at all to support such an assertion. Applying the *Kotteakos* standard, quoted at pp. 107–08, *supra*, we conclude that the error was harmless. Accordingly, Najafi's conviction is

*Affirmed.*